UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - X

LUMBERMENS MUTUAL CASUALTY COMPANY,    :

                    Plaintiff,    :

          - against -              :

FRANEY MUHA ALLIANT INSURANCE SERVICES  :
f/k/a FRANEY, PARR & MUHA, INC., FRANEY,
PARR & MUHA, INC. and FRANEY, PARR &    :
ASSOCIATES, INC.,
                                   :
                    Defendants.
                                   :
- - - - - - - - - - - - - - - - - - - - X

**ECF CASE**

04 Civ. 4376 (WCC)

**OPINION
AND ORDER**

**A P P E A R A N C E S :**

POST & SCHELL, P.C.
**Attorneys for Plaintiff**
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103

GARY A. WILSON, ESQ.
JOHN W. DORNBERGER, ESQ.

          Of Counsel

WADE CLARK MULCAHY
**Attorneys for Defendants**
111 Broadway, 9th Floor
New York, New York  10006

DENNIS M. WADE, ESQ.
MICHAEL A. BONO, ESQ.

          Of Counsel

**CONNER, Senior D.J.:**

Plaintiff Lumbermens Mutual Casualty Company ("Lumbermens") commenced the present action against defendants Franey Muha Alliant Insurance Services f/k/a Franey, Parr & Muha, Inc., Franey Parr & Muha, Inc. and Franey, Parr & Associates, Inc.[1] (collectively, "Franey" or "defendants") seeking indemnity for losses incurred under a reinsurance contract which plaintiff entered into with a non-party insurance company.[2]  Plaintiff also alleges negligence, breach of contract, breach of fiduciary duty and breach of duty of good faith and fair dealing.  In the present motions, pursuant to FED. R. CIV. P. 56, plaintiff moves for partial summary judgment and defendants move for summary judgment.  For the reasons stated hereinafter, plaintiff's motion for partial summary judgment is denied, and defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND

The following facts are undisputed unless otherwise noted.  Plaintiff, a mutual insurance company and the lead company of Kemper Insurance Company ("Kemper"),[3] is engaged in the

---

[1] Franey Muha Alliant Insurance Services f/k/a Franey, Parr & Muha, Inc., Franey Parr & Muha, Inc. and Franey, Parr & Associates, Inc. are "different incarnations of an insurance agency first opened by William Franey in 1973."  (Defs. Rule 56.1 Stmt. ¶ 1.)

[2] This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

[3] Historically, Kemper was engaged in the business of marketing most types of personal and commercial property and casualty insurance, primarily through independent insurance agents and brokers such as defendants in the present action.  (Complt. ¶ 13.)  Kemper's most significant product lines included "workers compensation, automobile coverage, commercial multi-peril, inland marine, directors and officers liability, professional liability, excess casualty, surety, warranty and homeowners insurance."  (*Id.* ¶ 14.)

business of, *inter alia*, underwriting and providing commercial property and casualty insurance products, including surety bonds. (Complt. ¶ 15; Pl. Rule 56.1 Stmt. ¶ 2; Defs. Rule 56.1 Stmt. ¶ 7.) Plaintiff is also engaged in the business of approving and issuing bonds based on bond applications it received from agents or brokers such as defendants. (Pl. Rule 56.1 Stmt. ¶ 2.) On March 1, 1997, plaintiff and defendants entered into a security agency agreement (the "Lumbermens Agency Agreement") that, among other things, authorized defendants to solicit and/or bind certain kinds of insurance, including bonds, on behalf of plaintiff as specified in the Lumbermens Agency Agreement. (*Id*. ¶ 5.) Plaintiff maintains that defendants were "authorized to solicit and bind plaintiff respecting contracts of insurance only to the extent that the authority was specifically granted in the Lumbermens Agency Agreement." (Complt. ¶ 17, Ex. A at ¶¶ 2-3.) The Schedule of Binding Authority Commercial Lines (the "Schedule") included in the Lumbermens Agency Agreement lists "specific classifications of commercial lines and corresponding limits" over which defendants could not write or bind plaintiff without plaintiff's express permission. (*Id*. ¶ 18, Ex. A at Schedule.) The Schedule also includes an independent classification entitled "Bonds," and provides that defendants must "refer" to plaintiff prior to writing or issuing a bond on plaintiff's behalf. (*Id*. ¶ 20, Ex. A at Schedule.) Specifically, defendants were required to "refer to the company" for express approval (or rejection) by plaintiff for any and all types of bonds (surety, fidelity or otherwise) prior to writing or issuing a bond on plaintiff's behalf because the Lumbermens Agency Agreement did not authorize defendants to bind plaintiff on such a transaction without plaintiff's express acceptance and consent. (*Id*. ¶ 21, Ex. A at Schedule; Pl. Rule 56.1 Stmt. ¶ 6.) Plaintiff contends that defendants, as its agents, "were required to act in strict compliance with industry practice and to insure that their duties and obligations to Lumbermens were carried out with

skill, diligence and care" and that defendants owed Lumbermens "a fiduciary duty and a duty of good faith and fair dealing." (Complt. ¶¶ 22, 23.) Additionally, plaintiff points out that at no time prior to July 10, 2001 did Franey or Lumbermens terminate the Lumbermens Agency Agreement. (Pl. Rule 56.1 Stmt. ¶ 7.)

### A.    Franey's Agency Relationship with Hanover[4]

Hanover, a non-party to the present litigation, is, similar to Lumbermens, engaged in the business of underwriting and providing insurance products and services, including surety bonds. (*Id.* ¶ 8.) Hanover also entered into an Agency Agreement (the "Hanover Agency Agreement") with defendants on January 1, 1977 which, *inter alia*, authorized defendants to solicit and bind certain kinds of insurance and bond applications on behalf of Hanover. (*Id.* ¶ 9.) The Hanover Agency Agreement "included a schedule entitled 'Limits of Authority,' which stated in paragraph one that Franey is 'authorized to solicit, receive, and transmit to the Company proposals for . . . fidelity and surety bonds . . .,' and [further stated] that Hanover had to specifically authorize underwriting any such bond." (*Id.*)

Plaintiff maintains that "[b]y entering into respective agency agreements with both Lumbermens and Hanover, [d]efendants were, in actuality, an agent for Lumbermens and were authorized to solicit and bind certain kinds of insurance on behalf of Lumbermens" while at the same time "an agent for Hanover and were likewise authorized to solicit and bind certain kinds of insurance on behalf of Hanover." (Complt. ¶ 26.) However, defendants point out that "Franey was

---

[4] All references to "Hanover" herein, refer to Hanover Insurance Company/Massachusetts Bay Insurance Company.

not bound by an exclusive agreement running to either Hanover or Lumbermens and was an independent agent." (Defs. Rule 56.1 Stmt. ¶ 21 (citing Van Steenburgh Dep. at 22-23; Franey Aff. ¶ 7; Exs. H, I).)

Beginning in 1978, Hanover wrote cable bonds for Adelphia Communications Corporation and related entities (collectively "Adelphia") on various obligations, including pole attachment bonds, franchise fee bonds, miscellaneous license bonds and performance/completion bonds. (Pl. Rule 56.1 Stmt. ¶ 10.) Franey was the exclusive agent for Hanover through which all Adelphia bonds were written. (*Id*.) In or about the early part of 2001, Hanover sought to decrease its overall cable bond exposure, which at that time exceeded $100 million. (*Id*. ¶ 11.)

Richard Van Steenburgh, Vice President of Surety for Hanover, notified Franey of its decision to reduce the risk on the Adelphia account and informed Franey that "one of Hanover's risk reduction options was to not write any new bonds for Adelphia." (Pl. Rule 56.1 Stmt. ¶¶ 12, 13 (citing Van Steenburgh Dep. at 64).) Van Steenburgh testified that "[t]he option of reducing Hanover's risk by discontinuing to write new bonds for Adelphia and its affiliates was not an acceptable option to William Franey," who said he would personally find the market, or other sureties, to share the Adelphia cable bond. (*Id*. ¶¶ 14, 15 (citing Van Steenburgh Dep. at 64-65).) However, according to defendants, it was Hanover that decided that the only acceptable option to decrease its liability was to enter into a quota-share reinsurance treaty, so as to avoid "the disruptive cancellation of outstanding bonds" and "the need to negotiate any indemnification agreements." (Defs. Mem. Supp. Summ. J. at 2.)

Moreover, Van Steenburgh testified that Franey identified and proposed Lumbermens to Hanover as the market for the Adelphia cable bond account and that, at that time, neither Hanover

nor Van Steenburgh had any type of business relationship with Lumbermens. (Pl. Rule 56.1 Stmt.

¶¶ 16, 17, 18 (citing Van Steenburgh Dep. at 64-66).) Defendants, however, contend that Franey

contacted Lumbermens regarding Hanover's need for reinsurance at the request of Hanover. (Defs.

Mem. Supp. Summ. J. at 2.)


### B.    Quota-share Reinsurance Treaty

Plaintiff entered into a Quota-share Reinsurance Treaty (the "Reinsurance Treaty") with

Hanover effective June 1, 2001.[5] (Defs. Rule 56.1 Stmt. ¶¶ 7, 8; Pl. Rule 56.1 Stmt. ¶ 19.) Plaintiff

contends that defendants acted as an intermediary between Lumbermens and Hanover and that "[a]ll

dealings between Lumbermens and Hanover, including the negotiation of the Reinsurance Treaty,

were exclusively handled through the [d]efendants, i.e., Lumbermens and Hanover only had contact

with the [d]efendants regarding the Reinsurance Treaty and there was no direct communication on

any issue related to the Reinsurance Treaty including the underwriting of cable bonds between

Lumbermens and Hanover." (Complt. ¶¶ 32, 33; Pl. Rule 56.1 Stmt. ¶¶ 21-23.) Plaintiff further

asserts that "[a]ll of the contact with Charles Schmalz[6] of Lumbermens during the formation of the

surety relationship between Hanover and Lumbermens prior to the execution of the Reinsurance

Treaty was with William Franey." (Pl. Rule 56.1 Stmt. ¶ 23.) Defendants admit that Franey acted

"as a conduit between Hanover and Lumbermens, passing papers between two markets," but note

---

[5] "Reinsurance is a transaction whereby the 'assuming reinsurer' agrees to indemnify the 'ceding insurer' (i.e. the reinsured) against all or part of a loss sustained under policies issued by the ceding insurer. 'Facultative' reinsurance is the reinsurance of an individual risk." *Bernstein v. Centaur Ins. Co.*, 644 F. Supp. 1361, 1364 n.2 (S.D.N.Y. 1986).

[6] Charles Schmalz was the President of the surety operation for Lumbermens during the relevant period.

that Franey did not write the language of the Reinsurance Treaty[7] or tell Schmalz[8] to sign the Reinsurance Treaty without reading it or otherwise trick him into signing it. (Defs. Rule 56.1 Stmt. ¶¶ 8, 10, 12, 15, 16.)

The Reinsurance Treaty provided in relevant part that "[t]he Reinsurer [Lumbermens] shall indemnify the Company [Hanover] for fifty percent of Ultimate Net Losses arising under all Surety bonds and Fidelity policies written on behalf of Adelphia Communications Corporation, its affiliates and subsidiaries as Principal." (Pl. Rule 56.1 Stmt. ¶ 20 (citing Ex. D at Art. 1).) Thus, once bound to the Reinsurance Treaty, plaintiff became responsible for fifty percent of the risk for all surety bonds written by Hanover on behalf of Adelphia, its affiliates and subsidiaries.

### C.     Allegheny Bond

On July 3, 2001, William Franey, on behalf of defendants, presented a bond submission to Hanover for a $15.5 million "guarantee bond" to be written on behalf of Adelphia and its subsidiary, Adelphia Business Solutions Long Haul, L.P., guaranteeing payment to Allegheny Communications Connect, Inc. ("Allegheny") with respect to a Fiber Optic Agreement entered into between Allegheny and Adelphia dated August 13, 1999, as amended by Addendum #1 through and including

---

[7] Van Steenburgh drafted the Reinsurance Treaty. (Defs. Rule 56.1 Stmt. ¶¶ 6, 11 (citing Van Steenburgh Dep. at 16).)

[8] Schmalz signed the Reinsurance Treaty on behalf of Lumbermens and was aware that the document he signed was, in fact, a reinsurance treaty. (Defs. Rule 56.1 Stmt. ¶¶ 13, 14 (citing Schmalz Dep. at 89-90, 96).) However, Schmalz testified that he did not read the agreement prior to signing it because he relied on Franey's oral representations about the nature of help that Franey was seeking on behalf of Hanover. (Schmalz Dep. at 104-06 ("[T]here was a representation on the part of Franey as to what we were trying to accomplish and what we were going to do. . . . It was on the basis of that representation that I signed the document.").)

Addendum #8 (the "Allegheny Bond"). (Complt. ¶¶ 36, 37; Pl. Rule 56.1 Stmt. ¶¶ 24, 25; Defs. Rule 56.1 Stmt. ¶ 22.) On July 7, 2001, Hanover advised David Summerall of Franey that "Hanover was unable to write the Allegheny Bond because of Hanover's concerns of the type and size of the Allegheny Bond, among other concerns."[9] (Pl. Rule 56.1 Stmt. ¶ 28.) Consequently, after Hanover expressed these initial concerns about issuing the bond, Franey presented the Allegheny Bond submission to Lumbermens to place directly, but Lumbermens rejected it by a specific refusal on July 10, 2001. (Pl. Rule 56.1 Stmt. ¶¶ 31, 35; Defs. Rule 56.1 Stmt. ¶ 23.) Plaintiff maintains that when Franey presented the Allegheny Bond to Lumbermens for consideration, it was as a stand-alone submission, and not for consideration under the Reinsurance Treaty. (Pl. Rule 56.1 Stmt. ¶¶ 32, 33.) In fact, when defendants presented the Allegheny Bond to Lumbermens, they indicated that Franey had already presented it to Hanover, which was unable to write it due to its size. (*Id*. ¶ 34 (citing Franey Dep. at 90).) Additionally, "[i]n his telephone call declining the Allegheny Bond, Charles Schmalz informed William Franey of Lumbermens' position that this Allegheny Bond was a financial guaranty bond, was not a cable pole attachment bond and was not the type or size of bond that Lumbermens intended to be covered by the Reinsurance Treaty." (*Id*. ¶ 36 (citing Schmalz Dep. at 114-15).)

Hanover, as mentioned above, originally refused to write or issue the Allegheny Bond; however, Hanover later authorized it to be executed. (Defs. Rule 56.1 Stmt. ¶ 24; Pl. Rule 56.1 Stmt. ¶ 37.) According to defendants, Hanover's initial concerns about issuing the Allegheny Bond were mitigated after Franey had provided additional information, partly through a conference call

---

[9] Plaintiff notes that "the Vice President of Surety at Hanover first reacted to the Allegheny Bond by declining it stating '[n]ow this one I REALLY don't like.'" (Pl. Mem. Supp. Partial Summ. J. at 15; Pl. Rule 56.1 Stmt. ¶ 27, Ex. F (emphasis in original).)

between Hanover and Adelphia, the principal on the bond. (Defs. Rule 56.1 Stmt. ¶ 24.) Hanover, through Van Steenburgh, testified that they conducted due diligence in underwriting the Allegheny Bond and do not attribute any misstatements of fact regarding the Allegheny Bond to Franey. (*Id*. ¶ 25 (citing Van Steenburgh Dep. at 205).) After final approval on July 16, 2001, Hanover issued the Allegheny Bond. (Pl. Rule 56.1 Stmt. ¶ 39.) Van Steenburgh testified that defendants never advised Hanover prior to July 16, 2001, that Lumbermens had previously declined the Allegheny Bond. (*Id*. ¶ 40 (citing Van Steenburgh Dep. at 51).)

By virtue of the Reinsurance Treaty, Lumbermens assumed fifty percent of the risk of all surety bonds written by Hanover on behalf of Adelphia, which included the Allegheny Bond. (Defs. Rule 56.1 Stmt. ¶ 26.)

### D.    **Lumbermens' Loss**

On May 27, 2002, Adelphia Business Solutions Long Haul, L.P. and several related entities filed for Chapter 11 bankruptcy protection in the United States District Court for the Southern District of New York.[10] (Complt. ¶ 50.) On June 10, 2002, Adelphia and several related entities also filed for Chapter 11 bankruptcy protection in the United States District Court for the Southern District of New York.[11] (Complt. ¶ 51.) As a result, Adelphia failed to make the June 15, 2002 payment to Allegheny as required under the Fiber Optic Agreement. On June 17, 2002, Allegheny submitted a claim to Hanover under the Allegheny Bond demanding the penal sum of the Allegheny

---

[10] *In re Adelphia Business Solutions, Inc., et al.*, Chapter 11 Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (the "Adelphia Business Solutions Bankruptcy").

[11] *In re Adelphia Communications Corp., et al.*, Chapter 11 Case No. 02-41729 (REG) (Bankr. S.D.N.Y. 2002) (the "Adelphia Communications Bankruptcy").

Bond in the amount of $15.5 million.  (*Id.* ¶¶ 52, 53.)

On September 30, 2002, Allegheny filed a complaint in the United States District Court for the District of Massachusetts against Hanover seeking to recover, *inter alia*, the penal sum of the Allegheny Bond.[12]  (Pl. Rule 56.1 Stmt. ¶ 41.)  Hanover reached a settlement in principal with Allegheny for $5.5 million.  (Defs. Mem. Supp. Summ. J. at 3.)

Lumbermens refused to acknowledge liability to Hanover and, on January 16, 2003, Hanover made a demand for arbitration, under Article 14 of the Reinsurance Treaty, against Lumbermens in connection with the Allegheny Bond, seeking fifty percent of the bond amount from Lumbermens, which amounted to $7.75 million.  (Defs. Mem. Supp. Summ. J. at 3; Pl. Rule 56.1 Stmt. ¶ 42.) Following the arbitration, Lumbermens and Hanover entered into an agreement (the "Settlement Agreement") whereby Lumbermens agreed to pay to Hanover $2.05 million in connection with the claim filed by Allegheny under the Allegheny Bond.  (Pl. Rule 56.1 Stmt. ¶ 42.)  Additionally, in defending the arbitration with Hanover, Lumbermens incurred attorneys' fees and costs in the amount of $230,054.70.  (*Id.*)

Lumbermens' total losses, which Lumbermens contends was "the direct and proximate result" of defendants' negligence, breach of contract, breach of fiduciary duty and breach of duty of good faith and fair dealing, totaled $2,280,054.70.  (Complt. ¶ 59.)  Plaintiff maintains that "[b]ut for [d]efendants' negligence, breach of contract, breach of their fiduciary duty to Lumbermens and breach of their duty of good faith and fair dealing, misrepresentations and/or deliberate omissions to Hanover and Hanover's assumption that the Allegheny Bond was agreeable to Lumbermens,

---

[12] *Allegheny Comm. Connect, Inc. v. Hanover Ins. Co.*, Civil Action No. 4:02-cv-40179-NMG (D. Mass. 2002) (the "Federal Court Action").

Hanover would not have authorized the Allegheny Bond to be written." (*Id.* ¶ 60.) Additionally, plaintiff contends that had defendants "performed in accordance with their contractual and professional obligations, the Allegheny Bond would not have been issued and Lumbermens would not have sustained this loss." (Pl. Rule 56.1 Stmt. ¶ 44.)

In the present motions, plaintiff moves for partial summary judgment and seeks a determination that, as a matter of law: (1) Franey was Lumbermens' express agent pursuant to the Lumbermens Agency Agreement when Franey presented the Allegheny Bond to Lumbermens on July 10, 2001; and (2) Franey was Lumbermens' express agent pursuant to the Lumbermens Agency Agreement for the Allegheny Bond. (Pl. Rule 56.1 Stmt. ¶ 45.) Defendants move for summary judgment and seek to have the Complaint dismissed on the basis that: (1) Franey owed no duty to plaintiff with respect to the Reinsurance Treaty and, therefore, can have no liability; and (2) plaintiff, as a reinsurer, lacks privity and standing to bring suit against defendants for any issue arising out of the placement of the Allegheny Bond. (Defs. Mem. Supp. Summ. J. at 4, 7.)

## DISCUSSION

### I.    Summary Judgment Standard

Under FED. R. CIV. P. 56, summary judgment may be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-50 (1986). A fact is material only if, based on that fact, a reasonable jury could find in favor of the non-moving party. *See Anderson*, 477 U.S. at 248. The burden rests on the movant to demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding whether summary

judgment is appropriate, the court resolves all ambiguities and draws all permissible factual inferences against the movant. *See Anderson*, 477 U.S. at 255. However, to defeat summary judgment, the nonmovant must go beyond the pleadings and "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The court's role at this stage of the litigation is not to decide issues of material fact, but to discern whether any exist. *See Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

## II.   Plaintiff's Motion for Partial Summary Judgment

Plaintiff moves for partial summary judgment and seeks a determination that, as a matter of law, pursuant to the Lumbermens Agency Agreement Franey was Lumbermens' express agent with respect to the Allegheny Bond. (Pl. Mem. Supp. Partial Summ. J. at 8.) Plaintiff further contends that the fiduciary obligations Franey owed to Lumbermens as its express agent extended to the Allegheny Bond. (*Id*. at 12.) Specifically, plaintiff maintains that the fact that Franey presented the Allegheny Bond to Lumbermens for consideration as a stand-alone submission pursuant to the Lumbermens Agency Agreement, and not for consideration under the Reinsurance Treaty, warrants a determination that Franey owed fiduciary duties to Lumbermens with respect to all transactions involving the Allegheny Bond that would impact Lumbermens. (*Id*. at 12-13.) Additionally, plaintiff maintains that Franey owed Lumbermens a duty as its agent under the Lumbermens Agency Agreement to "disclose all material facts to Lumbermens regarding the Allegheny Bond, including but not limited to the fact that Hanover had declined the Allegheny Bond due to its size and type of guaranty" and to "immediately advise Hanover of the Lumbermens' declination of the Allegheny

11

Bond." (*Id*. at 14.) Thus, according to plaintiff, once Franey presented the Allegheny Bond to Lumbermens directly under the Lumbermens Agency Agreement, Franey owed a continuing duty to exercise the utmost good faith to Lumbermens with respect to any transactions involving the Allegheny Bond. (*Id*. at 14-15.)

Defendants, however, note that the use of the term "agent" is not determinative of the nature of the relationship between the two parties, and contend that although the Lumbermens Agency Agreement was labeled an agency agreement, the agreement did not create "the kind of 'exclusive agency' that imposes a fiduciary duty under New York law because Franey lacked any relevant binding authority." (Defs. Mem. Supp. Summ. J. at 4-5.)

The question of whether an agency relationship exists is a mixed question of law and fact. *See Cabrera v. Jakabovitz*, 24 F.3d 372, 385 (1994) ("A determination that an agency relationship exists requires the application of a legal standard to a set of historical facts."). Therefore, "[u]nless the facts are insufficient to support a finding of agency or there is no dispute as to the historical facts, the question of agency should be submitted to the jury so that it may apply the applicable legal standard . . . to the facts, as the jury finds them." *Id*. (citing 3 C.J.S. *Agency* § 547 (1973) (footnotes omitted); *Slotkin v. Citizens Cas. Co.*, 614 F.2d 301, 317 (2d Cir. 1979), *cert. denied*, 449 U.S. 981 (1980)). However, where the "material facts from which [agency] is to be inferred are not in dispute, the question of agency is not open to doubt, and only one reasonable conclusion can be drawn from the facts in the case[,]" agency is a question for the court. *Cabrera*, 24 F.3d at 386 n.14 (quoting 3 C.J.S. *Agency* § 547 (footnotes omitted)).

"'Agency is the fiduciary relation which results from the manifestation of consent by one person [the principal] to another [the agent] that the other shall act on his behalf and subject to his

control and consent by the other so to act.'" *Merrill Lynch Inv. Mgrs. v. Optibase, Ltd.*, 337 F.3d 125, 130 (2d Cir. 2003) (quoting *Restatement (Second) of Agency* § 1 (1958)). Essential to the agency relationship is the notion that the agent acts subject to the principal's direction and control. *See In re Shulman Transport Enter., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984); *see also Sty-Lite Co. v. Eminent Sportswear Inc.*, No. 01 Civ. 3320, 2002 WL 15650, at *3 (S.D.N.Y. Jan. 7, 2002) ("Although there is no set rule for determining whether an entity is an agent of a principal or merely an independent contractor, an essential characteristic of an agency relationship is that the agent acts subject to the principal's 'direction and control.'"). Thus, agency requires a showing of "(1) the manifestation of the principal that the agent shall act for him, (2) the agent's acceptance of the undertaking, and (3) the parties' understanding that the principal is to be in control of the undertaking." *Manley v. Ambase Corp.*, 337 F.3d 237, 246 (2d Cir. 2003) (internal quotations omitted).

We agree with defendants that use of the term "agent" is not conclusive as to whether an agency relationship existed between Franey and Lumbermens during the relevant period. *See Conn. Mut. Life Ins. Co. v. Wolf*, No. 93 Civ. 5752, 1997 WL 597064, at *4 (E.D.N.Y. Sept. 24, 1997). It is well-recognized that "[t]he descriptive term 'agent' . . . is not necessarily determinative and its chief significance is for the purpose of statutory coverage. . . . The acts of a person and not the label attached may well determine in a practical sense and as a factual matter, the category into which the person falls." *Id.* (quoting *Friedman v. Markman*, 11 A.D.2d 57, 60, 201 N.Y.S.2d 743, 746 (1st Dep't 1960) (citations omitted)). Thus, whether an agency exists hinges predominately on the facts and circumstances of a particular case. *See* 2A C.J.S. *Agency* § 32 (2005).

In the case at bar, defendants acknowledge that Lumbermens and Franey entered into a

security agency agreement and that said agreement was in effect at the time the Allegheny Bond was issued. (William Franey Dep. at 52-53.) The Lumbermens Agency Agreement authorized defendants to solicit and bind Lumbermens with respect to certain types of insurance as set forth in the agreement and the Schedule attached thereto. (Pl. Mem. Supp. Partial Summ. J., Ex. B.) Therefore, with respect to the types of insurance that defendants were authorized to bind Lumbermens, it is clear that Franey was Lumbermens' agent. However, Lumbermens reserved the right to approve or reject certain types of bonds and other transactions as listed in the Schedule. Thus, with respect to any type of transaction that expressly required defendants to "refer to company," defendants were acting as a broker, rather than as plaintiff's agent. The authority to solicit certain types of insurance does not create an agency relationship. A party can be a principal's agent with respect to certain transactions, and merely a broker with respect to others. *See OneBeacon Ins. Co. v. Forman Int'l, Ltd.*, No. 04 Civ. 2271, 2005 WL 100849, at *4-5 (S.D.N.Y. Jan. 19, 2005); *see also Foisy v. Royal Maccabees Life Ins*., 356 F.3d 141, 151 (1st Cir. 2004). The proper classification largely depends on the facts and circumstances surrounding the particular transaction.

Neither party disputes that when Franey presented the Allegheny Bond to Lumbermens it was as a stand-alone submission pursuant to the Lumbermens Agency Agreement.[13] However, this does not change the fact that defendants were not authorized to bind Lumbermens to bonds such as the Allegheny Bond without Lumbermens' express permission. Consequently, when Franey presented the Allegheny Bond to plaintiff, Franey was merely acting as a broker, not as Lumbermens' express

---

[13] In fact, defendants admit, without reservation, that the Allegheny Bond was presented to Schmalz for consideration by Lumbermens outside the Reinsurance Treaty. (William Franey Dep. at 71.)

agent. The fact that Franey presented the bond to Lumbermens under the Lumbermens Agency Agreement is irrelevant to the question of whether Franey was Lumbermens' express agent because under the Lumbermens Agency Agreement, Franey was merely authorized to solicit, not bind, Lumbermens to bonds such as the Allegheny Bond. Consequently, we conclude that Franey was not Lumbermens' express agent pursuant to the Lumbermens Agency Agreement when Franey presented the Allegheny Bond to Lumbermens on July 10, 2001.

Plaintiff also maintains that Franey was Lumbermens' common law agent for the Allegheny Bond "created by actual, apparent and/or implied authority derived in part from Franey's special relationship with both Hanover and Lumbermens and [by] Franey's clear role as the sole and exclusive intermediary for both the Reinsurance Treaty and the Allegheny Bond." (Pl. Mem. Supp. Partial Summ. J. at 18.) However, plaintiff "intends to prove this common law agency at trial . . ., because unlike express agency, the issue is factually based." (*Id*.)

Accordingly, plaintiff's motion for partial summary judgment is denied.

### III.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the basis that: (1) the proximate cause of plaintiff's loss stems solely from the Reinsurance Treaty between plaintiff and Hanover; and (2) Franey did not owe a duty to plaintiff with respect to the Reinsurance Treaty. (Defs. Mem. Supp. Summ. J. at 4.) Thus, defendants maintain that they cannot be liable for plaintiff's losses. (*Id*. at 4.) Plaintiff, however, contends that its losses are a direct result of defendants' actions and that had "Franey performed in accordance with their contractual and professional obligations as an agent of Lumbermens, the Allegheny Bond would not have been issued and thereby Lumbermens would not

have sustained the loss." (Pl. Mem. Supp. Partial Summ. J. at 7.) In particular, plaintiff alleges that (1) Franey's dual agency obligations to Lumbermens and Hanover, (2) defendants' failure to disclose critical facts, particularly Lumbermens' rejection of the Allegheny Bond, and (3) the "alarming conflict" between Franey's principals - Lumbermens and Hanover - which arose when Lumbermens rejected the Allegheny Bond when it was offered directly to Lumbermens under the Lumbermens Agency Agreement and outside the Reinsurance Treaty, were the proximate cause of Lumbermens' losses and, therefore, defendants' motion for summary judgment should be denied. (Pl. Mem. Opp. Summ. J. at 9.)

It is uncontested that Franey presented the Allegheny Bond to Lumbermens as a stand-alone submission, which was rejected by Lumbermens. It is also uncontested that Hanover subsequently issued the Allegheny Bond which, because of the Reinsurance Treaty, resulted in plaintiff's losses. As defendants correctly point out: "Franey did not bind plaintiff to any bond resulting in a loss; plaintiff was exposed to a bond loss because of its participation in the Reinsurance Treaty with Hanover." (Defs. Mem. Opp. Partial Summ. J. at 4.) Stated simply, Lumbermens' obligations arising under the Reinsurance Treaty, to which Franey was not a party, was the proximate cause of Lumbermens' losses with respect to the Allegheny Bond. Schmalz signed the Reinsurance Treaty on behalf of Lumbermens with knowledge that the agreement he was signing was a quota-share reinsurance treaty. He further acknowledges that Franey did not trick him into signing the agreement or otherwise instruct him not to read the document. (*Id*.) In addition, Schmalz testified that he takes responsibility for the Reinsurance Treaty and "the results that come therefrom" because he signed the document on behalf of Lumbermens (Schmalz Dep. at 104-05.)

Moreover, defendants' failure to disclose allegedly "critical facts" regarding the Allegheny

Bond, such as Hanover's basis for the initial declination of the bond and Lumbermens' rejection of the bond, are not relevant to discerning the cause of plaintiff's loss because, pursuant to the terms of the Reinsurance Treaty, Lumbermens did not have the right, nor the ability, to review or reject any bond submissions presented to Hanover prior to Hanover's issuance of such bonds. (Defs. Mem. Opp. Partial Summ. J. at 8.) The Reinsurance Treaty was a quota-share treaty that automatically bound Lumbermens to fifty percent of any Adelphia risk written by Hanover and did not require Hanover to consult with Lumbermens prior to issuing bonds that were covered by the Reinsurance Treaty.[14] (*Id*. at 7-8, Ex. G.)

Plaintiff maintains that Franey breached the Lumbermens Agency Agreement by binding Lumbermens to the Allegheny Bond despite Lumbermens' rejection of the bond by Schmalz. (Pl. Mem. Supp. Partial Summ. J. at 12-13.) However, plaintiff ignores the fact that the explicit terms of the Reinsurance Treaty, signed by Schmalz on behalf of Lumbermens, bound Lumbermens on the Allegheny Bond; Franey did not bind Lumbermens on the bond. Consequently, plaintiff's breach of contract claim fails because Franey did not bind plaintiff on the Allegheny Bond; rather, the Reinsurance Treaty resulted in Lumbermens' liability with respect to the bond. Accordingly, plaintiff's breach of contract claim is dismissed.

Nonetheless, liability may be imposed on defendants for plaintiff's loss because unlike a breach of contract claim, "a claim for breach of fiduciary duty need not meet the standard requirements of causation and damages." *Pan Am Corp. v. Delta Air Lines, Inc*., 175 B.R. 438, 511

---

[14] Defendants note that if Lumbermens "wanted to retain control over the individual risk of each bond, [Schmalz] could have agreed to only participate in a co-surety agreement or in a facultative re-insurance arrangement." (*Id*. at 2.) However, Schmalz, "despite recognizing that the document forwarded by Franey from Hanover was a quota reinsurance treaty, signed the treaty and bound plaintiff to its terms and conditions. (*Id*.)

(S.D.N.Y. 1994) (citing *Milbank, Tweed, Hadley & McCloy v. Boon*, 13 F.3d 537, 543 (2d Cir. 1994)). "'An action for breach of fiduciary duty is a prophylactic rule intended to remove all incentive to breach -- not simply to compensate for damages in the event of a breach.'" *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 995-96 (2d Cir. 1983) (citing *Diamond v. Oreamuno*, 24 N.Y.2d 494, 498, 301 N.Y.S.2d 78, 81, 248 N.E.2d 910, 912 (1969)).

It is well-settled that the absence of a duty is fatal to a negligence or fiduciary duty claim. *See, e.g., Northeast Gen. Corp. v. Wellington Adver., Inc.*, 82 N.Y.2d 158, 162, 604 N.Y.S.2d 1, 624 N.E.2d 129 (1993) ("Before courts can infer and superimpose a duty of the finest loyalty, the contract and relationship of the parties must be plumbed."). Thus, "[i]f the parties find themselves or place themselves in the milieu of the 'workaday' mundane marketplace, and if they do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." *Id.* Consequently, in order for liability to exist on a breach of fiduciary duty claim, a plaintiff must demonstrate: (1) the existence of a fiduciary relationship; and (2) breach of a fiduciary duty. *See Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 37 (S.D.N.Y. 2002).

In denying plaintiff's motion for partial summary judgment, we concluded that Lumbermens and Franey did not have an express agency relationship under the Lumbermens Agency Agreement with respect to the Allegheny Bond. However, it does not necessarily follow that Franey did not owe fiduciary obligations to Lumbermens regarding the Allegheny Bond. Plaintiff maintains that even if Franey is not found to be an express agent of Lumbermens, fiduciary obligations toward Lumbermens nevertheless arose as a result of Franey's role as sole intermediary for the formation of the Hanover/Lumbermens relationship on the Adelphia account, as well as the Allegheny Bond

and the Reinsurance Treaty. (Pl. Mem. Supp. Partial Summ. J. at 18.)

Under New York law, "'[a] fiduciary relation exists between two persons when one of them is under a duty to act or to give advice for the benefit of the other upon matters within the scope of the relation.'" *Bank of Am. Corp. v. Lemgruber*, No. 02 Civ. 1041, 2005 WL 19274, at *16 (S.D.N.Y. Jan. 5, 2005) (quoting *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168, 521 N.Y.S.2d 672, 676 (1st Dep't 1987) (quoting Restatement [Second] of Torts § 874, comment a)). "While the 'exact limits' of what constitutes a fiduciary relationship are 'impossible of statement,' a fiduciary relationship may be found in any case 'in which influence has been acquired and abused, in which confidence has been reposed and betrayed.'" *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002) (quoting *Penato v. George*, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904 (2d Dep't 1976)). Thus, in determining whether a fiduciary relationship exists, "New York courts conduct a fact-specific inquiry into whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Facella v. Fed'n of Jewish Philanthropies of New York, Inc.*, No. 98 Civ. 3146, 2004 WL 1700616, at *6 (S.D.N.Y. July 30, 2004) (citing *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (finding a fiduciary relationship "exists when confidence is reposed on one side and there is resulting superiority and influence on the other")); *see also Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 122, 672 N.Y.S.2d 8 (1st Dep't 1998) (noting that whether a fiduciary duty exists "is necessarily fact-specific to the particular case") (citing New York cases).

It is well-settled that "liability for breach of a fiduciary duty 'is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.'" *Sergeants Benevolent Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 79 (1st Dep't

2005) (quoting Restatement [Second] of Torts § 874, comment b). It is not essential for a fiduciary relationship to be formalized in writing for fiduciary obligations to exist; rather, "'the ongoing conduct between parties may give rise to a fiduciary relationship that will be recognized by the courts.'" *Sergeants Benevolent Ass'n*, 796 N.Y.S.2d at 79 (quoting *Wiener*, 241 A.D.2d at 122). In addition, fiduciary duties may arise out of a contractual relationship which is independent of the contract itself. *See Bank of Am. Corp.*, 2005 WL 19274, at *16; *Mandelblatt*, 521 N.Y.S.2d at 676. For instance, "[i]f a contract establishes a relationship of trust and confidence between the parties, . . . then a fiduciary duty arises from the contract which is independent of the contractual obligation." *GLM Corp. v. Klein*, 665 F. Supp. 283, 286 (S.D.N.Y. 1987).

In the case at bar, plaintiff alleges that when Schmalz rejected the Allegheny Bond on behalf of Lumbermens, he informed Franey that this "was not the type of bond that Lumbermens intended to be covered by the Reinsurance Treaty." (Pl. Mem. Supp. Partial Summ. J. at 6.) Defendants, however, contend that when Schmalz rejected the Allegheny Bond he did not specify the reasons for the rejection. (Defs. Mem. Opp. Partial Summ. J. at 7.) Specifically, defendants call attention to the fact that when Schmalz was pressed about what he said to Bill Franey when he rejected the Allegheny Bond on Lumbermens' behalf, Schmalz testified "I don't recall what – all I know is that I said Bill, this is not something we can do. And this is not a bond we should be writing. That's, you know, again – I can't go further than that." (Schmalz Dep. at 120.) Thus, defendants maintain that they were never informed that Lumbermens did not intend the Allegheny Bond to be covered by the Reinsurance Treaty; therefore, Franey could not be required to inform Hanover of Lumbermens' position, even if a duty existed. (Defs. Mem. Opp. Partial Summ. J. at 7-8.)

Although defendants contend that Lumbermens' losses were a direct consequence of the

Reinsurance Treaty and that defendants therefore are not responsible for the loss, defendants ignore the fact that Lumbermens and Franey had an on-going relationship that may be construed as one of trust and confidence. Moreover, Franey was familiar with the terms of the Reinsurance Treaty and knew that if Hanover issued the Allegheny Bond, it potentially could result in substantial liability to Lumbermens because the Reinsurance Treaty would automatically bind Lumbermens to any bond Hanover issued on behalf of Adelphia. Additionally, Franey knew that Lumbermens did not want the Allegheny Bond to be issued; although defendants maintain that they were not aware of Lumbermens' rejection of the Allegheny Bond prior to Hanover's approval. (*Id*. at 9; Long Dep. at 167.)

Consequently, whether Franey knew: (1) that Lumbermens had rejected the bond prior to Hanover's decision to write the bond; and (2) that Lumbermens' position was that the Allegheny Bond was outside the Reinsurance Treaty, are questions of fact which would need to be resolved at trial. In addition, there are genuine issues of fact concerning whether Franey's actions or omissions with respect to the Allegheny Bond created any duty to Lumbermens that was thereafter breached by defendants' conduct. The underlying facts concerning the fiduciary obligations are in dispute and therefore cannot be considered on a motion for summary judgment.

Lastly, defendants' assertion that plaintiff, as a reinsurer, lacks privity and standing to bring suit against Franey for any issue arising out of the placement of the Allegheny Bond is without merit. (Defs. Mem. Supp. Summ. J. at 7-9.) Defendants maintain that "Franey did not place the bond directly on behalf of Lumbermens, and therefore, no contract between Lumbermens and Franey was applicable with respect to this transaction." (*Id*. at 8.) However, defendants completely ignore the fact that Lumbermens and Franey were parties to a separate agency agreement–the Lumbermens

Agency Agreement–and had an on-going relationship of trust and confidence. The present litigation is not premised on the rights and liabilities that stem from the Reinsurance Treaty. Rather, liability hinges on whether Franey breached fiduciary obligations to Lumbermens that may have arisen as a result of the parties' on-going relationship. The cases defendants rely on to support its "no privity" argument are clearly distinguishable from the present action because unlike the parties in those cases, Lumbermens and Franey had an on-going direct contractual relationship that may have created fiduciary obligations as a result of the parties' relationship.

Accordingly, defendants' motion for summary judgment is denied in all respects except for plaintiff's breach of contract claim which is hereby dismissed.

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for partial summary judgment is denied, and defendants' motion for summary judgment is granted with respect to plaintiff's breach of contract claim which is hereby dismissed, but denied in all other respects.

SO ORDERED.

Dated: White Plains, New York
September 19, 2005

*William C. Conner*

Sr. United States District Judge

22